Elliot Gale (Bar #263326)
egale@gajplaw.com
Joe Angelo (Bar #268542)
jangelo@gajplaw.com
Gale, Angelo, Johnson, & Pruett, P.C.
1430 Blue Oaks Blvd., Ste. 250
Roseville, CA 95747
916-290-7778 ph
916-721-2767 fax

Attorneys for Plaintiff
Russell Thomas

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| Russell Thomas<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>LendingClub Corporation<br>　　　　　　Defendants. | CASE NO. 5:20-cv-01453-GW-SP<br><br>AMENDED COMPLAINT FOR DAMAGES:<br><br>　1. Violation of Fair Credit Reporting Act;<br>　2. Violation of California Consumer Credit Reporting Agencies Act |

COMES NOW Plaintiff Russell Thomas, an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681i(a)(2)(A)), 15 U.S.C. §

1681i(a)(4)), and 15 U.S.C. §1681i(a)(5)(A)), and the California Consumer Credit Reporting Agencies Act, California Civil Code §1785.25(a).

2. All Defendants have settled except for LendingClub. To the extent this amended complaint references other Defendants such reference remains contextual only and no new claims are being pursued against those Defendants by Plaintiff.

3. Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's accounts with OneMain Financial Group, LLC (hereinafter "OneMain") and LendingClub Corporation (hereinafter "LendingClub").

4. Here, OneMain never updated Plaintiff's credit account to reflect it included and discharged in bankruptcy. Instead, OneMain, Experian, Equifax, and TransUnion all continue to report the account as charged off.

5. LendingClub's reporting in contrast constitutes a microcosm of the mess consumer's face when data furnishers do not follow proper reporting procedures for accounts transferred or sold.

6. LendingClub has filed a motion to dismiss which implies they no longer serviced the account when Plaintiff filed for Bankruptcy. LendingClub, however, failed to report its transfer or sale of the account to Equifax. Consequently, Plaintiff's Equifax report simply reflects that LendingClub still owns the debt and it has been charged off i.e., still owed.

7. Any creditor viewing Plaintiff's Equifax report would not know that LendingClub did not service and or own the debt and such debt has in fact been discharged.

8. In contrast, LendingClub reported to Experian the account "Charged-Off" and "transferred or sold." LendingClub, however, did not report who it sold

or transferred to and no other trade line on Plaintiff's credit report appears linked to LendingClub's account.

9. Consequently, Plaintiff's discharged debt remains untraceable and appears still collectable.

10. In addition, on the same Experian Tradeline LendingClub reported to Experian in December of 2019 a negative in Plaintiff's December of 2019 payment history, despite Plaintiff receiving his discharge ten months earlier in February of 2019.

11. Thus, any creditor looking at Plaintiff's Experian report would assume LendingClub transferred the account in December of 2019, the debt not discharged, and have no idea who currently owns or services Plaintiff's debt.

12. LendingClub reported to Trans Union the account "Charged Off" and "transferred" but failed to list when it was transferred or to whom.

13. Consequently, LendingClub continues to report the account in a manner that is wholly untraceable and makes it appear that Plaintiff still owes a debt to some entity somewhere.

14. Such reporting is wholly inaccurate, misleading, and adversely impacts Plaintiff's credit worthiness.

15. Plaintiff's credit score has been adversely impacted by the reporting; he has been unable to rebuild his credit score and obtain favorable interest rates.

16. Third parties have been exposed to the inaccurate OneMain and LendingClub tradelines.

17. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods

undermine the public confidence, which is essential to the continued functioning of the banking system.

## JURISDICTION & VENUE

18. Plaintiff re-alleges and incorporates herein by reference the allegations in each and every paragraph above, fully set forth herein.

19. The Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681

20. The venue is proper pursuant to 28 U.S.C. §1391(b)(1).

21. Plaintiff lives in Riverside, California and entered into the transactions with the defendants in the State of California.

## GENERAL ALLEGATIONS

22. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for accurate credit reporting in an attempt to purposefully undermine Plaintiff's attempt to improve his FICO Score.

23. In the alternative Plaintiff alleges that each and every Defendant's actions was the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

### FICO, Inc.

24. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

25. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

26. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

27. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

28. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

29. There are 28 FICO Scores that are commonly used by lenders.

30. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).

31. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Inc. and Transunion, LLC.

32. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

33. There are five key factors that a FICO Score considers: 1) Payment History 2) Amount of Debt 3) Length of Credit History 4) New Credit and 5) Credit Mix.

34. Each of the five factors is weighted differently by FICO.

35. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

36. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the

late payment information, the greater the impact on a FICO Score. Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

37. In factoring the severity of delinquent payments a FICO Score considers how late the payment continues to be, how much is owed, how recently they occurred, and how many delinquent accounts exist.

38. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

39. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

40. A consumer's FICO score is negatively impacted when an adverse authorized user account is reported.

### Metro 2

41. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

42. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.

43. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

44. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

45. The CDIA is *the* expert on accurate credit reporting. In support of his allegations Plaintiff avers the following:
    a. The CDIA offers a FCRA certificate program for all CRAs.
    b. The CDIA offers a FCRA awareness program for all CRAs.
    c. The CDIA offers a FCRA Certificate program for DFs.
    d. The CDIA offers a FCRA awareness program for DFs.
    e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.
    f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.
    g. The CDIA developed a credit reporting resource guide for accurately reporting credit.
46. The CDIA's Metro 2 is accepted by all CRAs.
47. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).
48. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.
49. The three main credit bureaus helped draft the CRRG.
50. The CRRG is not readily available to the public. It can be purchased online for $229.45.
51. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.
52. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

53. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

54. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.

### Transferring accounts

55. A consumer's account(s) should tell a story and should have a beginning, middle, and an end.

56. When creditors improperly transfer accounts, a consumer's account story becomes disorganized, confusing, and as in Plaintiff's case, results in a consumer being incorrectly labeled less credit worthy because a debt no longer collectable still appears on Plaintiff's credit report in a collectable manner.

57. The CRRG's guidelines for transferring or selling accounts is simple but rarely followed.

58. There are two contemplated ways in which an account can be sold or transferred.

59. The first way results in a single trade line existing post-transfer, while the second way results in two tradelines appearing that contain an account's entire history i.e. traceability.

60. The preferred method, and most accurate way in which an account can be transferred or sold, is to simply convert / transfer all of the account history to the new servicer or owner.

61. Thereafter the original trade line is replaced with a new single tradeline with a new account number and new creditor listed but with all of the original servicer/owner's account history reported.

62. The second contemplated transfer method results in two trade lines. The original tradeline will report all of the account history up until the transfer/sale and the new account will pick up where the last account stopped. The original creditor must list who the new servicer/owner is and the new creditor must list the original creditor on the new trade line. Such reporting makes the debt traceable and allows future lenders a full and complete picture (story) of an account's history.

63. The CRRG does NOT contemplate, suggest, or otherwise imply a hypothetical outside of the two examples provided herein. Specifically, the CRRG does not contemplate a situation where accounts are simply transferred without all information being converted into a new account or a second traceable tradeline appears on a consumer's credit report.

64. The CRRG is clear that the parties involved in the transfer or sale of accounts need to communicate to ensure accurate and complete reporting.

### e-OSCAR

65. E-OSCAR is the web-based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax, Inc.; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

66. When a consumer sends a dispute letter to a CRA the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.

67. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

### Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator

68. When a consumer files bankruptcy certain credit reporting industry standards exist.

69. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.

70. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

71. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.

72. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

73. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

74. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge entered.  This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts any potential lender that the account is no longer in a collectable status but is being handled by a Chapter 13 trustee.

75. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.

76. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

77. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.
78. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.
79. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.
80. The lack of a CII reported also suggests that creditors are free to collect against a consumer as an individual or that no stay exists to prevent *in personam* collection activity.
81. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.
82. Under the Fair Credit Reporting Act a bankruptcy can be reported for ten years.
83. The ten-year rule for reporting runs from the date the bankruptcy was *filed*.
84. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.
85. The more time that has passed since the filing of the bankruptcy, the less negative impact the bankruptcy will have on a consumer's FICO Score. Failure to reference the bankruptcy filing (CII field) and or the correct petition date shall result in a lower FICO Score resulting in those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

**Plaintiff's Bankruptcy**

86. Plaintiff filed for Chapter 7 bankruptcy protection on October 28, 2018 in order to discharge various debts and improve Plaintiff's credit worthiness and FICO score.

87. Plaintiff received a Chapter 7 discharge on February 11, 2019.

88. On May 11, 2020 Plaintiff ordered a credit report from Experian, Equifax, and TransUnion to ensure property reporting by Plaintiff's creditors after entry of his chapter 7 bankruptcy discharge.

89. Plaintiff noticed tradelines from OneMain, LendingClub, and Cashcall on the May 11, 2020 credit report that was reporting inaccurate, misleading, and incomplete information regarding Plaintiff's accounts with those respective lenders.

90. OneMain, LendingClub, and Cashcall were all reporting that the various accounts were charged off and without any notation that the accounts were subject to a bankruptcy discharge.

91. In response, Plaintiff disputed the inaccurate OneMain, LendingClub, and Cashcall tradelines via certified mail with Experian, Equifax and TransUnion on May 22, 2020.

92. Plaintiff's dispute letter specifically put OneMain, LendingClub, and Cashcall on notice that Plaintiff had filed for bankruptcy and received a discharge and that the accounts should not be listed as charged off but rather as included and discharged in bankruptcy.

93. Plaintiff is informed and believes that each CRA received Plaintiff's dispute letter, and in response, sent Plaintiff's dispute to OneMain, LendingClub, and CashCall via an ACDV through e-OSCAR.

94. On June 26, 2020, after the statutory time period had passed for Plaintiff to receive a reinvestigation report from the CRAs, Plaintiff ordered a second credit report from Experian, Equifax, and TransUnion for the sole purpose of ensuring Plaintiff's accounts with OneMain, LendingClub, and Cashcall had been properly updated.

95. The OneMain, LendingClub, and CashCall accounts on Plaintiff's Experian, Equifax, and TransUnion reports still listed the accounts as charged off and did not reflect that it was included or discharged in bankruptcy.

**Inaccuracy – LendingClub**

96. Plaintiff was frustrated to see that Defendant LendingClub did not properly update the account but instead continued to report Plaintiff's account as charged off in three distinct manners to each of the three main CRAs.

97. To start, to the extent LendingClub transferred or sold its account, it failed to list who it sold or transferred the account to on its trade line. Moreover, no other tradeline that appears on Plaintiff's credit report appears related to LendingClub's account.

98. In addition, LendingClub reported the account in slightly different ways to each CRA.

99. LendingClub reported to Experian that the account was "Charged Off" and "transferred" but failed to list who the account was transferred to. In addition, LendingClub reported a "negative" in December of 2019 in Plaintiff's payment history, ten months after Plaintiff received a discharge.

100. LendingClub simply reported the account "Charged Off" to Equifax without any notation of the account being sold and or transferred.

101. LendingClub reported the same account to TransUnion as "sold or transferred" but once again failed to list the new servicer.

102. Given that only a single trade line exists with respect to Plaintiff's debt LendingClub should have updated the CII on Plaintiff's account to reflect the underlying debt discharged.

103. LendingClub did not update Plaintiff's account to indicate that it was included and discharged in bankruptcy – instead continuing to report on Plaintiff's credit report as if no bankruptcy was filed.

104. Such reporting makes it appear that Plaintiff is still obligated to make payments on the LendingClub debt and that the account was not included or discharged in bankruptcy.

105. LendingClub has not updated the CII to reflect that the account was ever subject to the terms of Plaintiff's Chapter 7 filing nor subsequently discharged.

106. Rather than updated the CII to an "E" LendingClub continues to report to TransUnion the account is charged off, consequently, appears that Plaintiff still must make payments to LendingClub on the account.

107. To the extent LendingClub allegedly transferred the account LendingClub transferred the account without following proper transferring procedure resulting in a single misleading tradeline still appearing on Plaintiff's credit report as a debt owed when in fact Plaintiff's obligation was discharged.

108. To the extent LendingClub allegedly transferred or sold Plaintiff's account LendingClub could not report the account sold and or transferred without disclosing who the account was transferred to and ensuring the account would be reported.

109. To the extent LendingClub allegedly transferred or sold Plaintiff's account it could not report the account sold or transferred unless it KNEW that the new account servicer/owner would in fact report the account.

110. To the extent LenginClub allegedly transferred or sold Plaintiff's account it failed to report any transfer or sale to Equifax, it failed to report to Experian and Trans Union who the account was transferred to, and based on the account not being related to any other account on Plaintiff's report LendingClub should have reported the account discharged in bankruptcy.

111. Instead, a single trade line exists that suggests either Plaintiff still owes a debt to LendingClub (Equifax report) or in the alternative it was

transferred to some hereto unknown entity (Experian and Trans Union reports) as late as possibly December of 2019 (Experian report).

### Willfulness

112. LendingClub new it could not report an account sold and or transferred IF the new servicer/owner would not report the account.
113. LendingClub knew that the new servicer/owner was not reporting the account and that it therefore must report the bankruptcy.
114. LendingClub had actual knowledge of the bankruptcy but refused to update the CII.
115. This was not a negligent act by LendingClub but instead an intentional act to purposefully undermine Plaintiff's ability to effectively restore Plaintiff's credit through bankruptcy.
116. LendingClub did not follow industry in transferring/selling the account
117. LendingClub is not following industry standards and is not listing the correct consumer information indicator (CII) as the CII should be updated to an "E" as Plaintiff's bankruptcy has been discharged.
118. By indicating that the account is charged-off without noting the bankruptcy it appears that Plaintiff has filed to address this outstanding account, still owes LendingClub money, and that the LendingClub account was not included/discharged in bankruptcy.
119. By noting the CII-E potential lenders are alerted to the fact that the account has been included and discharged in bankruptcy.
120. Once LendingClub received Plaintiff's dispute, rather than acknowledge the bankruptcy filing and subsequent discharge, LendingClub continued to report the account as if no bankruptcy had been filed and no discharge had been entered.

121. LendingClub's reporting of the charged-off notation is an attempt to have Plaintiff make payments on the account in order to remove the derogatory and inaccurate account information.

122. LendingClub reported negative and derogatory account information nearly twelve months after entry of Plaintiff's chapter 7 discharge; this was done in an attempt to have Plaintiff make a payment on the account post-discharge in order to remove the derogatory information.

### Damages

123. As a result of the incorrect reporting, Plaintiff has suffered economic loss, diminished credit, and emotional harm.

124. In addition, Plaintiff's fresh start has been irreparably harmed and continues to be harmed by the LendingClub reporting as that reporting has been disclosed and disseminated to various third-party lenders. Until LendingClub's reporting has been properly updated Plaintiff continues to appear a severe credit risk.

125. The actions of LendingClub, as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

### FIRST CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against Defendants)

**LendingClub – Failure to Reinvestigate.**

126. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

127. 15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update

and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

128. Defendant LendingClub violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

129. The CRAs provided notice to LendingClub that Plaintiff was disputing the inaccurate and misleading information, but LendingClub failed to conduct a reasonable investigation of the information.

130. Based on Plaintiff's dispute, LendingClub should have known its account was included in Plaintiff's Chapter 7 discharge.

131. The most basic investigation would include a simple review of well-established credit reporting industry standards.

132. Plaintiff alleges LendingClub did not review well established industry standards for credit reporting.

133. If LendingClub had reviewed such standards LendingClub would have seen its reporting was not in compliance and consequently inaccurate and or incomplete.

134. With respect to LendingClub any reasonable investigation by LendingClub would have uncovered that to the extent it sold or transferred its account the transfer was not done properly resulting in LendingClubs trade line appearing incomplete and therefore inaccurate.

135. Such an investigation would be unreasonable.

136. Plaintiff also alleges that LendingClub did not investigate whether Plaintiff filed for bankruptcy and whether a discharge was entered.

137. The lack of investigation is unreasonable.

138. Plaintiff further alleges that LendingClub have not properly trained those directly investigating disputes on Metro 2 generally or credit reporting

industry standards and as such have developed reckless policies and procedures.

## SECOND CAUSE OF ACTION
(Violation of California Consumer Credit Reporting Agencies Act California Civil Code § 1785.25(a) Against Defendants)

**LendingClub – Reporting Inaccurate Information to CRAs.**

139. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

140. In the regular course of its business operations, LendingClub routinely furnish information to credit reporting agencies pertaining to transactions between Defendants and Defendant's consumers, so as to provide information to a consumer's credit worthiness, credit standing and credit capacity.

141. LendingClub intentionally and knowingly reported misleading and inaccurate account information to the CRAs that did not follow with well-established industry standards.

142. Plaintiff alleges that lendingClub re-reported the information contained herein in violation of California Civil Code § 1785.25(a).

143. Plaintiff also allege that OneMain and LendingClub had reason to know that the information reported on Plaintiff's account were misleading, inaccurate, and incomplete.

144. Plaintiff allege thatS LendingClub had reason to know that by not complying with well-established industry standards lenders will draw a more negative inference with respect to Plaintiff's credit worthiness.

145. Plaintiff alleges that the dispute letters from all three credit reporting agencies, the consumer data industry resource guide, and results of its investigation should have provided notice to LendingClub of its misleading and inaccurate reporting.

146. LendingClub failed to notify Experian, Equifax, and TransUnion that the information LendingClub re-reported was inaccurate before the end of 30 business days, in violation of California Civil Code § 1785.25(a).

147. LendingClub's communications of false information, and repeated failures to investigate, and correct their inaccurate information and erroneous reporting were done knowingly, intentionally, and in reckless disregard for their duties and Plaintiff's rights.

148. As a direct and proximate result of LendingClub's willful and untrue communications, Plaintiff has suffered actual damages including but not limited to reviewing credit reports from all three consumer reporting agencies, time reviewing reports with counsel, sending demand letters, diminished credit score, denial of credit, and such further expenses in an amount to be determined at trial.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;
2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n and California Civil Code § 1785.31;
3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n; and California Civil Code § 1785.31
4. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o; California Civil Code § 1785.31;
5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and
6. For determination by the Court that Creditor's policies and practices

are unlawful and in negligent violation of 15 U.S.C. § 1681o.

**Gale, Angelo, Johnson, & Pruett, P.C.**

Dated: November 25, 2020        */s/ Joe Angelo*
Joe Angelo
Elliot Gale
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.

**Gale, Angelo, Johnson, & Pruett, P.C.**

Dated: November 25, 2020        */s/ Joe Angelo*
Joe Angelo
Elliot Gale
Attorneys for Plaintiff